**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------X
MYRA BRYANT and CHRISTINE CLOTSOS,

                         Plaintiffs,

            -against-

PHOENIX MEDICAL SERVICES PC d/b/a ROCKVILLE
CENTER PAIN MANAGEMENT AND REHABILITATION,
NATACHA HERNANDEZ *individually* and WILLIAM
JONES MD *individually*,

                        Defendants.
---------------------------------------------X

**COMPLAINT**

Case No.: _____

PLAINTIFFS DEMAND
A TRIAL BY JURY

Plaintiffs, Myra Bryant and Christine Clotsos, by their attorney, The Rose Law Group PPLC upon information and belief, complains as follows:

## NATURE OF THE CASE

1. Plaintiffs complain pursuant to the Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166) ("Title VII") and the New York State Executive Law §296 et. seq. ("NYSHRL") seeking declaratory and injunctive relief and damages to redress the injuries Plaintiff has suffered as a result of being **discriminated** against on the basis of their **race, association with members of another race, gender and religion** and **retaliated against** for the protected activities described herein.

2. Plaintiffs also complain of violations of the NYLL §§ 215, 740 and the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq* for failure to pay minimum wage, overtime, failure to provide wage statements and notices, failure to pay agreed upon benefits, and retaliating against each Plaintiff due to their opposition to Defendants' illegal practices.

## JURISDICTION AND VENUE

3.      Jurisdiction of this Court is proper under 28 U.S.C. §§ 1331 and 1343.

4.      The Court has supplemental jurisdiction over the claims of Plaintiff brought under state law pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in this district based upon Defendant being within the City of New York and existing within the Eastern District of New York. 28 U.S.C. §1391(b).

## PARTIES

6.      That at all times relevant hereto, Plaintiff Myra Bryant ("Bryant") is a resident of the State of New York and Queens County.

7.      Plaintiff Bryant was, during all relevant times, an employee of Defendant Phoenix Medical Services, PC d/b/a Rockville Center Pain Management and Rehabilitation.

8.      That at all times relevant hereto, Plaintiff Christine Clotsos ("Clotsos") is a resident of the State of New York and Queens County.

9.      Plaintiff Clotsos was, during all relevant times, an employee of Defendant Phoenix Medical Services, PC d/b/a Rockville Center Pain Management and Rehabilitation.

10.     Defendant Phoenix Medical Services, PC ("Phoenix") is and was a Domestic Professional Service Corporation duly existing by the laws of the State of New York with its principle place of business being 165 N. Village Ave, Ste 5, Rockville Centre, New York 11570.

11.     That at all times relevant hereto, Defendant Phoenix has done business as Rockville Center Pain Management and Rehabilitation as well as Rockville Centre Pain Management & Rehabilitation and Grand Concourse Pain Management. At all times this was a single entity referred to herein as "RVC".

12.     That at all times relevant hereto, Defendants are located at 165 N Village Ave, Rockville Centre, NY 11570.

13. That at all times relevant hereto, Defendant Natacha Hernandez ("Hernandez") was the Plaintiffs' supervisor.

14. That at all times relevant hereto, Defendant William Jones ("Jones") was the physician and owner. Defendant Jones also managed Plaintiffs as described herein.

15. At all times the Defendants were employers of Plaintiffs and acted in concert to commit the acts described herein.

16. Defendants conducted more than $500,000.00 in business each year the Plaintiffs were employed and handled goods which were moved in interstate commerce.

## PROCEDURAL PREREQUISITES

17. Plaintiffs filed charges of discrimination upon which this Complaint is based with the Equal Employment Opportunities Commission ("EEOC").

18. Plaintiffs received a Notice of Right to Sue from the EEOC and commenced this action within 90 days of receipt of said Right to Sue.

## MATERIAL FACTS RELATED TO PLAINTIFF BRYANT

19. Plaintiff Bryant is an African American female who practices the African Traditional Religion ("ATR").

20. On or about May 1, 2017, Plaintiff Bryant was hired by Defendants as an Assistant to the Administrator.

21. Plaintiff Bryant and Defendant Natacha met at RVC where they discussed the new position, negotiated a wage, and benefits including medical insurance that Defendant RVC would pay for in its entirety.

22. Plaintiff Bryant was set to be hired onto the Administration staff. Defendant Natacha told Plaintiff Bryant that she should receive a contract by January 2019 that included benefits, such as life insurance and a 401k.

23.     The promises laid out in the contract were never fulfilled. When Plaintiff Bryant consulted
        Defendant Natacha regarding her benefits, Defendant Natacha would respond, "it's Doctor
        Jones," blaming him for the failure to pay the offered and accepted benefits.

24.     Plaintiff Bryant was initially making a salary of $57,000.00.

25.     After her value and performing all work in exemplary fashion, Plaintiff Bryant received a
        raise to $60,000.00.

26.     Each year, Plaintiff Bryant was promised an increase of 5%.

27.     As time passed, Plaintiff Bryant's workload increased significantly.

28.     During work hours, Defendant Natacha would spend significant time making personal phone
        calls with her children, picking them up from school, and going shopping. The majority of
        Defendant Natacha's primary functions were delegated to Plaintiff Bryant. Plaintiff Bryant's
        compensation at this time was not commensurate of the level of responsibility she had.

29.     Plaintiff Bryant pointed out her compensation compared to her workload to Defendant
        Natacha several times. Defendant Natacha would respond, "What more do you want? There
        are plenty of people in need of job. You should be thankful".

30.     The workload became impossible for Plaintiff Bryant to manage alone. Plaintiff Bryant asked
        Defendant Natacha for assistance on the workload when she was told, "You should stop
        complaining because you're making a lot of money. I'm not hiring someone else."

31.     Plaintiff Bryant was assigned tasks she did not feel comfortable with. For instance, Plaintiff
        Bryant was assigned to do Defendant Jones's CME credit courses. Defendant Natacha told
        her the courses were her responsibility. At the end of the course, there are a series of tests to
        take and Defendant Natacha told Plaintiff Bryant, "You better not fail." Upon information and
        belief, by law Defendant Jones was required to do the trainings and he was not permitted to
        delegate his responsibility to employees, as he did to Plaintiff Bryant.

32. Throughout her employment, Plaintiff Bryant was continuously humiliated, demoralized, verbally abused in front of colleagues. Defendants also discriminated against Plaintiff Bryant on a regular basis, harassing her on account of her race, gender and religion.

33. Defendant Natacha explained to Plaintiff Bryant that she was known as the "white girl" by some of the patients and gloated over how fond she was of this title.

34. Defendant Natacha explained to Plaintiff Bryant that she did not cater to the "Upper Class" when doing her job because most of the patients were Black, low lives, thugs, or poor Spanish people who were mostly Central American who spoke little English and had little to no education.

35. Defendant Natacha explained to Plaintiff Bryant that her partner of over twenty-two (22) years was "not like others" because he was well spoken and treated her well. Defendant Natacha explained further that these traits were not like most Black men.

36. Defendant Natacha told Plaintiff Bryant that she forbids her daughter to date Black men and systematically encourages her to only date White men. Defendant Natacha continuously labels Black men as thugs, drug dealers and criminals.

37. Defendant Natacha told Plaintiff Bryant that she was not like most Black people because she is Canadian.

38. On the occasion that Plaintiff Bryant would confront Defendant Natacha regarding her bias and racism, Defendant Natacha insisted that her son has a Black friend and therefor she could not be racist.

39. Plaintiff Bryant's objections towards Defendant Natacha did not stop her from her continual belittlement and mistreatment of people of color.

40. On or about July 2017, Defendant Natacha told Plaintiff Bryant and other colleagues that she did not tan because she did not like "dark skin" and thus, she stayed out of the sun.

5

41.   Defendant Natacha was aware that Plaintiff Bryant practiced Lucumi ("ATR"). Defendant Natacha would repeatedly tell Plaintiff Bryant, "Don't tell anyone in the office what you practice." Defendant Natacha explained to her that her religion doesn't look good for the Administration as the other colleagues would think she was a "crazy devil worshiper."

42.   Other staff members practiced Wicca. Defendant Natacha allowed them to "bless" the office as well as place Effigies and trinkets around the office and hanging from the windows.

43.   On one occasion, Defendant Natacha believed the office to be cursed because of the high turnover rate. Defendant Natacha directed Plaintiff Bryant to do a "cleansing of the office." When Plaintiff Bryant explained that she did not feel comfortable doing so, Defendant Natacha insisted that she still do it. Plaintiff Bryant eventually "cleansed" the office as directed under duress.

44.   Any time the opportunity arose, Defendant Natacha would humiliate Plaintiff Bryant for her religious views.

45.   By way of example, Defendant Natacha would repeatedly tell Plaintiff Bryant not to tell others that she practices ATR and repeat the comments alleged *supra*. Defendant Natacha also instructed Plaintiff Bryant not to wear prayer beads in the workplace, restricting her religion while others were not restricted in their religious expression.

46.   On one occasion, when Plaintiff Bryant was wearing waste beads, a Ghanian jewelry which she was sent from her sister, Defendant Natacha noticed them and pulled her into a side room and told her that she was not permitted to wear these beads as she believed them to have religious significance. When Plaintiff Bryant told Defendant Natacha that they were not religious, Defendant Natacha reacted by telling her not to let anyone see them as she did not want anyone to find out about Plaintiff Bryant's religious beliefs.

47.   Defendant Natacha further informed Plaintiff Bryant that if Defendant Jones learned of her

religious beliefs then he would terminate her because he is a Christian.

48. These statements were made multiple times a week while Defendant Natacha would demand Plaintiff Bryant instruct her on how she practices her religion. Plaintiff Bryant repeatedly told Defendant Natcha that she was not comfortable and asked that she not be required to instruct her in the religious practices at work.

49. Defendant Natacha would demand that Plaintiff Bryant tell her stories from her religion which are used as instruction, then she would deride and insult Plaintiff Bryant for the content of the stories.

50. Defendant Natacha would bully Plaintiff Bryant into doing tasks for the Defendants' children regularly. These tasks included things such as picking up Defendant Natacha's children from school and take them wherever they had to be next.

51. Occasionally, Defendant Natacha would make Plaintiff Bryant accompany her on shopping trips during office hours. Plaintiff Bryant did not feel comfortable accompanying Defendant Natacha on these trips during office hours.

52. Defendant Natacha would direct Plaintiff Bryant to take tweezers and pull the hairs out of Defendant Natacha's chin. Defendant Natacha would state, "You're my assistant" implying that it was part of Plaintiff Bryant's job description.

53. Defendant Natacha stole gifts from Plaintiff Bryant that the staff would give her. On one instance, Plaintiff Bryant received a gift bag full of spa merchandise from a staff member. Before Plaintiff Bryant could open the gift bag, Defendant Natacha went through the bag, took what she want and said, "You don't need this".

54. Plaintiff Bryant was consistently asked to purchase things for the office despite her financial situation. For example, Defendant Natacha directed Plaintiff Bryant to purchase Locksmith keys for the office. They keys totaled $188.00. It was not until weeks later that Defendants

reimbursed Plaintiff Bryant for this purchase.

55.   Often, Defendant Natacha would ask Plaintiff Bryant to pick her up at various locations that were completely unrelated to work.

56.   Defendant Natacha would berate and belittle Plaintiff Bryant in front of staff members creating a hostile work environment.

57.   Multiple instances occurred where Defendant Natacha would direct the staff aloud, "Don't speak to Myra. Leave her alone. If anyone wants to talk to her, you will be written up."

58.   Defendant Natacha did this often when she felt that staff members leaned towards Plaintiff Bryant for direction more so than her. This left staff members confused because Plaintiff Bryant was their supervisor as well.  Upon information and belief, Defendant Natacha berated Plaintiff Bryant because of her Race and/or Religious views.

59.   For the first year of Plaintiff Bryant's employment, Defendant Natacha would not let her speak with Dr. Jones directly. Any and all work that had involved Defendant Jones, Defendant Natacha would do herself. Defendant Natacha told Plaintiff Bryant that access to Defendant Jones had to be earned because he did not trust anyone.

60.   Defendant Natacha told Plaintiff Bryant that Defendant Jones had a long-term affair with his previous office manager. Defendant Natacha explained that Defendant Jones's relationship with his previous office manager was active both inside and outside the office.

61.   After being informed of this information, Plaintiff Bryant grew more alert of her interactions with Defendant Jones. Plaintiff Bryant requested to Defendant Natacha limit her access to Defendant Jones.

62.   Soon after, Defendant Jones began coming into the office more frequently.

63.   In or around November 2017, Plaintiff Bryant received a new "assignment". Plaintiff Bryant was designated to be the only employee to bring Defendant Jones his lunch. Plaintiff Bryant

had to bring Defendant Jones his lunch the way "he liked it", usually a slice of pizza or two and a drink. The pizza had to be in a separate plate, wrap the fork and knife in a napkin and bring it to his office hot.

64. Plaintiff Bryant grew very uncomfortable with Defendant Jones as he began to drape his arm around her and speak to her in a low tone. It was clear that Defendant Jones was attempting to initiate a sexual relationship with Plaintiff Bryant.

65. Plaintiff Bryant directly and explicitly informed Defendant Natacha that she did not intend to engage in a sexual relationship with Defendant Jones. After this, Defendant Jones became verbally abusive.

66. Soon after this, Defendant Jones asked Plaintiff Bryant if she was "stupid" because he did not understand a situation that was going on at the office.

67. Upon information and belief, Defendant Jones was attempting to coerce Plaintiff Bryant into engaging in a sexual relationship with him. His mannerisms and implications were that he expected Plaintiff Bryant to initiate these actions.

68. Plaintiff Bryant reported to Defendant Natacha about Defendant Jones's behavior with her. Defendant Natacha told Plaintiff Bryant, "That is why I told him not to speak with the staff. He always does this." Upon information and belief, Defendant Natacha was referring to how Defendant Jones would always attempt to engage in sexual relationships with staff.

69. On or about September 1, 2020, Plaintiff Bryant discovered that there were procedures that were being billed systematically and were not performed by Defendant Jones. When Plaintiff Bryant brought the matter to the attention of Defendant Natacha, she told her that she would discuss the discrepancy with Defendant Jones.

70. Plaintiff Bryant was given a single template for every body part receiving treatment which included what to bill insurance companies for services provided to patients. Plaintiff Bryant

only did the reports for surgeries which have to be submitted to insurance companies to get paid. The templates which Defendant Natacha provided to Plaintiff Bryant for lumbar discectomy always included a billing for annuloplasty, which upon information and belief could be part of the lumbar discectomy, but not frequently.

71.     In or around late August of 2020, Plaintiff Bryant raised this issue with Defendant Natacha, asking first what the annuloplasty procedure required and then questioning if it was repeatedly performed in every lumbar discectomy.

72.     Plaintiff Bryant asked Defendant Jones if an annuloplasty was performed in relation to a specific procedure. Defendant Jones responded that it had not been performed.

73.     Plaintiff Bryant then informed Defendant Natacha that the template included annuloplasty even when it had not been performed. Defendant Natacha responded that she "would take care of it and speak to Dr. Jones."

74.     Upon information and belief, Plaintiff Bryant was terminated the following week due to this opposition to healthcare fraud.

75.     On or about September 5, 2020, Plaintiff Bryant left work early because she was sick. Defendant Natacha showed up to Plaintiff Bryant's home, uninvited and unannounced. Defendant Natacha told Plaintiff Bryant that Defendant Jones believed they were like "water and oil." Defendant Natacha verbally terminated Plaintiff Bryant.

76.     At the time of termination, Defendant Natacha informed Plaintiff Bryant to apply for unemployment for a few months and to "relax." Defendant Natacha promised Plaintiff Bryant her insurance will continue until December and she would receive vacation pay. Plaintiff Bryant was never paid her vacation pay.

77.   Plaintiff Bryant asked Defendant Natacha if she was terminated because Defendant Jones was offended because she wasn't "friendlier" (sexually open) with him. Defendant Natacha replied to her saying, "Don't know what to say."

78.   Plaintiff Bryant repeatedly asked, "What is the exact reason?"  Defendant Natacha replied, "Its Dr. Jones."

79.   Defendants terminated Plaintiff Bryant due to her rejection of Defendant Jones' sexual advances.

80.   Plaintiff Bryant was further terminated for her raising issues which she reasonably believed to be health insurance fraud, e.g. billing for annuloplasty without performing the procedure.

81.   Defendants were aware that they were violating the law by discriminating against and retaliating against Plaintiff Bryant.

82.   As a result of the acts and conduct complained of herein, Plaintiff Bryant has suffered a loss of income, bonus, benefits, and other compensation which such employment entails. Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

83.   As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff Bryant demands Punitive Damages as against the Defendants.

**MATERIAL FACTS RELATED TO PLAINTIFF CLOTSOS**

84.   Plaintiff Clotsos in a White female.

85.   In or around January of 2018, Plaintiff Clotsos was hired by Defendants as a Medical Assistant for the "Travel Team".

86.   The Travel Team consisted of Plaintiff Clotsos and one other employee who went to various offices where Defendants provided services to coordinate patient visits and perform clerical work.

87.     Throughout Plaintiff Clotsos's employment, she was a reliable and successful team member.

88.     Plaintiff Clotsos was hired as an hourly employee making $16.00 per hour. After performing her work in exemplary fashion, Plaintiff Clotsos received a raise to $26.00 per hour.

89.     In or around January of 2018, Plaintiff Clotsos was promoted to team supervisor. Plaintiff Clotsos worked extremely long hours and traveled to all five boroughs as needed.

90.     In or around December of 2020, Plaintiff Clotsos received an additional raise to $30.00 per hour.

91.     Despite being hired as an hourly employee, Plaintiff Clotsos did not receive additional pay for all hours worked, including those in excess of forty (40) hours each week.

92.     Despite working in excess of forty (40) hours each week, Plaintiff Clotsos only received pay for the first forty (40) hours and received nothing after that.

93.     Every week, Plaintiff Clotsos worked an additional five (5) to ten (10) hours, depending on the work load and job location. Plaintiff Clotsos would travel to and from locations as necessary and, while in each location, coordinate patients and schedules on behalf of Defendants.

94.     Plaintiff Clotsos was scheduled to work various schedules depending on the office to which she was assigned for the day. While each office had an eight (8) hour schedule, Plaintiff Clotsos was required to stay late in order to complete her duties. This usually resulted in a nine (9) or ten (10) hour work day five (5) days each week.

95.     Plaintiff Clotsos was not paid anything for those hours over forty (40) and further was not paid the overtime premium of one and a half times her pay for hours in excess of forty (40).

96.     Often, Plaintiff Clotsos would attempt to consult her supervisor, Defendant Natacha, regarding the failure to compensate her for all hours worked.

97.     However, Defendant Natacha simply said that Plaintiff Clotsos was a supervisor, seemingly claiming that Plaintiff Clotsos was a salaried employee. However, Plaintiff Clotsos was only paid for hours she actually worked, so if she worked fewer than forty (40) hours in a week Defendants would reduce her pay, as a result she was not salaried and Defendants were required to pay her overtime and for all hours worked.

98.     Further, Plaintiff Clotsos only supervised one other individual on a regular basis.

99.     Defendants also failed to provide wage notices and wage summaries each pay period so it was impossible for Plaintiff Clotsos to determine how much she was being paid and why, other than based on what she received in direct deposit.

100.    Frequently, Defendant Natacha would demand that Plaintiff Clotsos purchase items for work and then wait weeks to reimburse Plaintiff Clotsos. She also demanded Plaintiff Clotsos pay for lunches for which she was never reimbursed.

101.    When Plaintiff Clotsos approached Defendant Natacha regarding her overtime pay she was often dismissed. Defendant Natacha would tell her she did not "need" the pay, "your family is okay" and "you're not like these people." Upon information and belief, "these people" referred to Black and minority individuals.

102.    Upon hiring, Defendant Natacha promised Plaintiff Clotsos she would be reimbursed for her travel expenses including mileage, gas, parking and tolls. Plaintiff Clotsos was only reimbursed for tolls and only given one year of parking. These additional benefits were never paid by Defendants.

103.    On occasion, Defendant Natacha would assign Plaintiff Clotsos to work from home. Plaintiff Clotsos was never paid for those hours.

104.    Upon hiring, Plaintiff Clotsos was supposed to receive healthcare. Defendant Natacha told Plaintiff Clotsos that she would receive health insurance after a three month probation period.

105.    Plaintiff Clotsos did not receive health insurance until in or around January of 2020.

106.    The insurance was issued from Blue Cross/Blue Shield. Defendant Natacha told Plaintiff Clotsos to be thankful for the insurance because the she had to "beg" Dr. Jones for the insurance.

107.    In or around January of 2019, Defendant Natacha directed Plaintiff Clotsos to buy a second phone to communicate at off-site locations. Defendant Natacha said she would pay for the phone bill. Defendant Natasha only paid for the month of January and Plaintiff Clotsos was left to pay the phone bill of $77.50 per month from February to August of that same year.

108.    These benefits were promised as benefits of employment which were promised by Defendants and which were earned by Plaintiff Clotsos.

109.    Plaintiff Clotsos's employee contract stated that all staff was entitled to two (2) weeks of paid vacation, four (4) sick days, three (3) personal days and all legal holidays. However, Plaintiff Clotsos never received compensation for a full week of vacation.

110.    On several occasions, Defendant Natacha would now allow Plaintiff Clotsos to take her requested days off.

111.    On one occasion, Plaintiff Clotsos requested a week vacation off for a trip to Puerto Rico she was planning. Defendant Natacha denied her request and Plaintiff Clostos was forced to cancel her trip and report to work instead. As a result, Plaintiff Clostos was not compensated in the manner and amount required by both the law and her agreement with the Defendants.

112.    Defendant Natacha fostered an abusive, controlling, and hostile work environment.

113.    After a few months of employment, Defendant Natacha gained knowledge that Plaintiff Clotsos's boyfriend was a Black male. Initially, Defendant Natacha began making veiled comments about Black men.

114. As time went on, Defendant Natacha grew comfortable and made more blatant remarks to Plaintiff Clotsos about her boyfriend's race.

115. Plaintiff Clotsos only came to the office once a week. Every time she came into the office, Defendant Natacha made comments to Plaintiff Clotsos calling her boyfriend a "thug", "criminal", and "drug-dealer". She went further to say, "they all are." Defendant Natacha harassed Plaintiff Clotsos that her boyfriend was only with her because she had money to bail him out of jail and repeatedly asked her, "Why can't you find a White guy?" Defendant Natacha claimed that a White male would be much better for Plaintiff Clotsos.

116. On one occasion, Plaintiff Clotsos received a Chanel purse for Christmas from her boyfriend. Defendant Natacha insisted that her boyfriend was able to buy her the purse because he was "selling drugs" and a relationship "like that" would get her nowhere in life.

117. Defendant Natacha consistently pressured Plaintiff Clotsos to leave her boyfriend and find another boyfriend that was "not like him."

118. Plaintiff Clotsos uses hair extensions to give her hair a more voluminous look. For this reason, Defendant Natacha asked her if she "was trying to be Black."

119. Defendant Natacha cyber-bullied Plaintiff Clotsos by sharing to other employees Instagram pictures and videos of Plaintiff Clotsos with inappropriate comments, such as, "Only hoes do videos like this" and "she's like a porn star."

120. Defendant Natacha constantly mocked Plaintiff Clotsos's clothing in front of other staff members.

121. Defendant Natacha created a hostile work environment between the staff and Plaintiff Clotsos. Defendant Natacha told staff members that Plaintiff Clotsos was a gossiper and not to be trusted. These comments alienated Plaintiff Clotsos from the rest of her team because no one wanted to communicate with her.

122.   Upon information and belief, this was because Plaintiff Clotsos was dating a Black man.

123.   Defendant Natacha habitually yelled at Plaintiff Clotsos in front of colleagues, staff members and Physician assistants. Often times, Defendant Natacha would direct Plaintiff Clotsos to do a specific task. When Plaintiff Clotsos would complete the task, Defendant Natacha would yell, "Who told you to do that!" in front of staff members to make it appear that Plaintiff Clotsos was incompetent and lose confidence in her.

124.   Defendant Natacha would direct staff members to recommend unnecessary procedures to patients. When Plaintiff Clotsos would question the recommendations, Defendant Natacha would raise her voice at her saying, "Don't ask questions and do your job! You are not the decision maker!"

125.   Defendant Natacha embarrassed Plaintiff Clotsos and her staff members. For instance, Defendant Natacha made everyone wear paper hats labeled "Burro" meaning Donkey in English. She then gloated about how a previous supervisor used to make his staff members do the same.

126.   Upon information and belief, this harassment was directed at Plaintiff Clotsos because of her boyfriend's race.

127.   Defendant Natacha put Plaintiff Clotsos under uncomfortable circumstances on many occasions. For one instance, Plaintiff Clotsos had a new pair of Limited Edition UGG boots that Defendant Natacha expressed to her she wanted them. For two months, Defendant Natacha pressured Plaintiff Clotsos to give them to her because she "didn't need them". When Plaintiff Clotsos did not give up her pair of UGG boots, Defendant Natacha told her, "don't come back next week" if she did not give her the boots. In fear of losing her job, Plaintiff Clotsos gave Defendant Natacha the boots.

128.   On multiple occasions, Defendant Natacha would order food for the staff and offer Plaintiff Clotsos to pay for the food order.

129.   Defendant Natacha would make Plaintiff Clotsos order items for her home. However, Defendant Natacha submitted the receipts to Dr. Jones office to make it appear as if the items were purchased for the office.

130.   During the stay at home order, Defendant Natacha directed Plaintiff Clotsos to drive to Brooklyn from her home in New Jersey at 11:00 p.m. at night for a client. Defendant Natacha told Plaintiff Clotsos that, "your job is on the line" if she did not do as she was told.

131.   On or about May 19, 2020, Defendant Natacha directed Plaintiff Clotsos to return her laptop that she was using for work.

132.   Plaintiff Clotsos drove from New Jersey to Long Island where she met Defendant Natacha in a mall parking lot to hand over the laptop.

133.   Defendant Natacha told Plaintiff Clotsos that she was disappointed in her for collecting unemployment because she did not "need it" and "it won't last forever." Defendant Natacha also called the staff collecting unemployment "low lives", including Plaintiff Clotsos.

134.   During the exchange, Defendant Natacha informed Plaintiff Clotsos that when she returned they would pay her for eighty (80) hours even if she would work over ninety (90), would reduce her salary by $10,000.00, and they would no longer pay for her health insurance.

135.   Upon information and belief, Defendant Natacha was attempting to force Plaintiff Clotsos to resign so that she would not receive unemployment benefits for being terminated.

136.   Plaintiff Clotsos complained about this policy, saying that she should not be forced to work hours for which she is not being compensated.

137.   On June 1, 2020, in retaliation for her objection to these illegal policies, Defendant Natacha terminated Plaintiff Clotsos by mail. Plaintiff Clotsos' insurance had been canceled on May 31, 2020 without any prior notification.

138.   Defendants were aware that their actions violated the law.

139.   As a result of the acts and conduct complained of herein, Plaintiff Clotsos suffered a loss of income, bonus, benefits, and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

140.   As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands liquidated and Punitive Damages as against the Defendants.

### AS A FIRST CAUSE OF ACTION
### FOR DISCRIMINATION UNDER TITLE VII
### (Not against the individual Defendants)

141.   Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint.

142.   This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., for relief based upon the unlawful employment practices of the above-named Defendant RVC.   Plaintiffs complain of Defendants' violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's race, gender, sexual harassment, and association with members of a specific race.

143.   Defendant RVC engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by discriminating against Plaintiffs.

### AS A SECOND CAUSE OF ACTION

## FOR DISCRIMINATION UNDER TITLE VII
### (Not against the individual Defendants)

144.    Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint.

145.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a) provides that it shall be unlawful employment practice for an employer:

"(1) to . . . discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

146.    Defendant RVC engaged in unlawful employment practice prohibited by 42 U.S.C. §2000e et seq. by discriminating against Plaintiffs with respect to the terms, conditions or privileges of employment because of their opposition to the unlawful employment practices of Defendant.

## AS A THIRD CAUSE OF ACTION
## FOR DISCRIMINATION UNDER STATE LAW

147.    Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint.

148.    Executive Law § 296 provides that  "1. It shall be an unlawful discriminatory practice: "(a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

149.    Defendants violated the section cited herein as set forth.

## AS A FOURTH CAUSE OF ACTION
## FOR RETALIATION UNDER STATE LAW

150.    Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint.

151.    New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice:

"For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because [s]he has opposed any practices forbidden under this article."

152.    Defendants violated the section cited herein as set forth.

## AS A FIFTH CAUSE OF ACTION
## FOR RETALIATION UNDER STATE LAW
## (On behalf of Plaintiff Bryant)

153.    Plaintiff Bryant repeats and realleges each and every allegation made in the above paragraphs of this complaint.

154.    The New York Labor Law §740 provides the following:

2. Prohibitions. An employer shall not take any retaliatory personnel action against an employee because such employee does any of the following:

(a)  discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety, or which constitutes health care fraud;

(b)  provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any such violation of a law, rule or regulation by such employer;  or

(c)  objects to, or refuses to participate in any such activity, policy or practice in violation of a law, rule or regulation.

155.    Defendants violated the section cited herein as set forth.

## AS A SIXTH CAUSE OF ACTION
## VIOLATION OF THE FAIR LABOR STANDARDS ACT
## (On behalf of Plaintiff Clotsos)

156. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if same were set forth herein fully at length.

157. Defendants willfully employed Plaintiff in the afore-mentioned enterprise and failed to compensate Plaintiff for all hours worked during her employment.

158. Defendant failed to pay any wages for hours worked by Plaintiff as described herein and as is required by the FLSA.

159. Defendants also failed to provide the overtime premium rate of one and a half times her regular hourly rate as is required by the FLSA.

160. Defendants' violations were willful.

161. Defendants' failure to comply with the FLSA caused Plaintiff to suffer loss of wages and other damages as described and demanded herein.

**AS A SEVENTH CAUSE OF ACTION**
**VIOLATION OF NEW YORK LABOR LAW**
**(On behalf of Plaintiff Clotsos)**

162. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if same were set forth herein fully at length.

163. Plaintiff was employee of Defendants within the meaning of New York Wage Regulations (NYCRR Labor Section 138 et seq.).

164. Defendants failed to pay Plaintiff at least the minimum wage for all time worked.

165. Defendants' failure to comply with the New York Labor Law minimum wage protections caused Plaintiff to suffer loss of wages and interest thereon.

166. Defendants' failure to pay proper wages for each hour worked was willful.

167. Defendants also failed to pay overtime pay as is required by the New York Labor Law.

168. Defendants further failed to pay spread of hours wages for shifts which Plaintiff worked lasting more than ten (10) hours.

169.    On account of such violations, Defendants are liable to Plaintiff for actual, statutory and liquidated damages.

### AS A EIGHTH CAUSE OF ACTION FOR
### VIOLATION OF NEW YORK LABOR LAW (wage notice and statement)

170.    Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint as if same were set forth herein fully at length.

171.    At all times relevant to this action, Plaintiffs were employed by Defendants within the meaning of New York Labor Law §§ 190 et seq., including §§ 191, 193, 195, 198 and the applicable regulations thereunder.

172.    At all times relevant herein, Defendants, individually and/or jointly, failed and willfully failed to provide Plaintiff with the notice(s) required by NYLL 195(1) – Plaintiffs are therefore entitled to and seek to recover in this action the maximum recovery for this violation, plus attorneys' fees and costs pursuant to NYLL 198 including NYLL 198(1-b).

173.    At all times relevant herein, Defendants, individually and/or jointly, failed and willfully failed to provide Plaintiffs with the statement(s) required by NYLL 195(3) – Plaintiffs are therefore entitled to and seeks to recover in this action the maximum recovery for this violation, plus attorneys' fees and costs pursuant to NYLL 198 including NYLL 198(1-d)

### AS AND FOR A NINTH CAUSE OF ACTION
### VIOLATION OF NEW YORK LABOR LAW (retaliation)
### (On behalf of Plaintiff Clotsos)

174.    Plaintiffs repeats and realleges each and every allegation made in the above paragraphs of this complaint as if same were set forth herein fully at length.

175.    Plaintiffs Clotsos complained to Defendants about their improper pay practices and the intent to not compensate her for all hours worked.

176.    Defendants then retaliated against Plaintiff Clotsos by terminating her employment.

177.    This action violates the New York Labor Law § 215.

178.   As a result of this violation, Plaintiff Clotsos has suffered and continues to suffer loss of wages, benefits and emotional damages for which Defendants are liable.

179.   Plaintiff Clotsos is further entitled to reinstatement, liquidated damages, injunctive relief and attorneys' fees and costs.

## JURY DEMAND

180.   Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs respectfully requests a judgment against the Defendants:

A.   Declaring that the Defendants engaged in unlawful employment practices prohibited by Title VII, the NYSHRL, the FLSA and the NYLL as described herein;

B.   Awarding damages to the Plaintiffs, retroactive to the date of termination, for all lost wages and benefits resulting from Defendants' unlawful employment practices;

C.   Awarding Plaintiffs compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to their reputation in an amount to be proven;

D.   Awarding Plaintiffs back wages, unpaid wages, unpaid benefits, overtime premium, and other compensatory damages as claimed herein;

E.   Awarding Plaintiffs punitive and liquidated damages;

F.   Ordering that Defendants reinstate Plaintiffs with full backpay, benefits, and seniority;

G.   Awarding Plaintiffs attorney's fees, costs, and expenses incurred in the prosecution of the action; and,

H.  Awarding Plaintiffs such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants' unlawful employment practices.

Dated:  Astoria, New York
        July 30, 2021

                                        **THE ROSE LAW GROUP, PLLC**

                                        _____/s/Jesse C. Rose_____
                                        Jesse C. Rose (JR-2409)
                                        3272 Steinway St; Suite 503
                                        Astoria, New York 11103
                                        PH: (718) 989-1864
                                        Fax: (917) 831-4595